[No. 3408–2.   Division Two.   September 5, 1979.]

THE STATE OF WASHINGTON, *Respondent,* v. THOMAS A. OWEN, *Appellant.*

*John M. Rosellini,* for appellant.

*Curtis M. Janhunen, Prosecuting Attorney,* and *Douglas G. Lewis, Deputy,* for respondent.

SOULE, J.—Defendant Thomas Owen appeals from his conviction for delivery of a controlled substance. RCW 69.50.401. He raises two issues on appeal: (1) whether the trial court erroneously instructed the jury that "the use of a special agent, or so called 'informer,' by a law enforcement agency is not in violation of law or of anyone's rights"; and (2) whether a new trial was mandated by several post–trial affidavits, one submitted to show juror misconduct, and five others submitted to show defendant's whereabouts on the night of the crime. After a careful examination of the record, we affirm.

At about 10 p.m. on December 18, 1975, defendant contacted Steven Clear at a Montesano bowling alley. Defendant said, "You are just the person I have been looking for. I have got some acid for sale, sixteen, or fourteen hits." Clear

was a Washington State Patrol commissioned agent who had been posing as a drug user in the Montesano area for approximately 3 weeks. He had met with defendant and defendant's friends, who were also suspected drug users, several times during that period and expressed an interest in buying drugs.

Clear accompanied defendant into the lavatory where defendant sold him 10 tablets for $20. Clear put them in a cellophane wrapper and then went with defendant to a friend's house. At 12:30 a.m., Clear went to a telephone booth where he called the Montesano Chief of Police and arranged a meeting to transfer the evidence to him. The chief picked him up and took the cellophane–wrapped tablets. He put them in an evidence bag and sealed it until an Officer Kelly could transfer it to the Seattle crime laboratory. The crime laboratory examiner determined that the pills were LSD.

Defendant's trial attorney conducted a voir dire examination of the jury specifically focusing on the propriety of the State using undercover agents:

BY MR. STRITMATTER:

Q. Mrs. Schlesser, considering the nature of the crime involved here, it is a drug offense, and considering that drug offenses are often difficult to detect, would you agree with the idea of the use of undercover agents? Do you agree that it is often necessary and proper to use undercover agents to detect crimes of drug offenders?

A. Yes.

Q. Would you agree that there is nothing improper about the use of undercover agents to detect violations or drug offenses?

A. Yes.

Q. The fact that one of the State's witnesses, and its prime witness, will be an undercover agent, that will have no effect on your judgment in the case?

A. No.

. . .

Q. Mr. Lewin, you have been asked the question whether you believe in the use of an undercover agent in

regard to various crimes. Do you believe in an under-cover agent soliciting the commission of a crime in order to make an arrest?

A. I don't think that would be right if he is soliciting.

. . .

Q. Mrs. Aldridge, do you believe that an undercover agent should solicit the commission of a crime in order to make an arrest?

A. I really don't have any opinion on it at all. I imagine that, you know, I don't think there is anything wrong with soliciting.

Several other questions and answers in this vein took place during voir dire examination. When the State and defendant had both rested their cases, defendant took his exceptions to the court's proposed instructions:

MR. STRITMATTER: Your Honor, the defendant objects to Proposed No. 14:

"I instruct you as a matter of law that the use of a special agent, or so–called 'informer', by a law enforce-ment agency is not in violation of law or of anyone's rights."

on the ground that this would tend to mislead the jury in regard to the facts of this case and I don't feel that this instruction is necessary at this posture of the case except it confuses the jury.

. . .

THE COURT: I normally wouldn't give that instruction, but in view of the questions and comments elicited from the jurors during the voir dire I have concluded that there is a good likelihood that some of them are going to be waiting for my advice as to whether the use of a spe-cial agent is in violation of some law or someone's rights. Therefore, I feel that I am obliged to give them a com-ment, and that is the most innocuous way I could think to put it.

We affirm the trial court's use of this instruction for two reasons. First, defendant excepted to the instruction at trial on grounds that it would mislead and confuse the jury as to the facts, but he contends for the first time on appeal that the instruction was improper as a comment on the evidence. Where trial counsel's exception to an instruction and his discussion do not clearly apprise the trial court of

the points of law involved, the instruction cannot be challenged on appeal. CrR 6.15(c). *State v. Barriault,* 20 Wn. App. 419, 581 P.2d 1365 (1978). Secondly, even permitting defendant to raise his new argument on appeal, we hold that the instruction in no way prejudiced him.

■ For an instruction to fall within the constitutional ban on comments on the evidence, it must convey or indicate to the jury a personal opinion or view of the trial judge regarding the credibility, weight or sufficiency of some evidence introduced at the trial. *State v. Alvis,* 70 Wn.2d 969, 425 P.2d 924 (1967); *State v. Galbreath,* 69 Wn.2d 664, 419 P.2d 800 (1966). Whether or not there has been a prohibited comment depends on the facts and circumstances of each case. *State v. Jacobsen,* 78 Wn.2d 491, 477 P.2d 1 (1970). In this case, the numerous voir dire questions concerning the propriety or legality of using an undercover agent, and the uncertain answers given by some of the jurors made it reasonable for the trial court to give a brief explanatory instruction, and the instruction was not an unconstitutional comment on the evidence since it was not reasonably inferable by the jury that the judge believed or disbelieved the informant witness. *See State v. Nesteby,* 17 Wn. App. 18, 560 P.2d 364 (1977).

Next, defendant assigns as error the trial court's failure to grant a new trial on the basis of several post–trial affidavits: one affidavit was submitted to show that juror Karroll Aldridge concealed the fact that she knew defendant before trial and disliked him, and five other affidavits were submitted to show that on the night of the crime, defendant was nowhere near the bowling alley, but was visiting the affiants, a group of his friends.

After conviction, defendant replaced his trial attorney. His new attorney subsequently withdrew the motion for a new trial. The record contains a note by his new attorney:

Done—             Re: *State v. Owen*
  I agree to have my motion for new trial *stricken.* It will not be re–noted by the way.
                    J. Ben Zderic

■ Since the motion for new trial was stricken by agreement, the trial court had no opportunity to consider the six supporting affidavits. *See* RAP 2.5(a); *State v. Weygandt*, 20 Wn. App. 599, 581 P.2d 1376 (1978). We need not review this issue, because defendant failed to exhaust his post–trial remedies by moving for a new trial under CrR 7.6, or for relief from judgment under CR 60(b)(3).

■ We observe, however, that the first affidavit submitted by Karroll Aldridge's son–in–law indicates that defendant must have been personally acquainted with Ms. Aldridge and he must have known at the time she was questioned on voir dire that she was concealing her acquaintance with him:

> DALE RICHARD JONES, being first duly sworn on oath, deposes and says:
> 1. That Affiant is the son–in–law of Carol Aldridge, juror on the trial of the Defendant, THOMAS OWEN, of the charges contained herein.
> 2. *That Carol Aldridge knew the defendant prior to the time of the trial and had expressed to Affiant a dislike for the Defendant in that she stated that she did not like his looks and did not want him coming to her house anymore.*
> 3. That to Affiant's knowledge, Carol Aldridge did not inform the Court of her acquaintanceship and dislike for the Defendant.

(Italics ours.) Defendant had some burden, in our view, to question Ms. Aldridge further or reveal this acquaintance when she failed to do so. *See State v. Hicks*, 75 Wn.2d 73, 76, 448 P.2d 930 (1968). He said nothing; nor did he challenge her for cause or exercise one of his peremptory challenges against her, although they were never exhausted. In short, defendant's tactical decision concerning Karroll Aldridge apparently was to keep quiet and gamble on the verdict, perhaps thinking he had a friend on the panel. He doubtless would have been perfectly satisfied with her had the jury found him not guilty.

■ We further observe that the five other affidavits, which were submitted to show defendant's whereabouts, all contained evidence which was available to the defense before trial by the exercise of due diligence, and was merely cumulative to defendant's own alibi testimony. A new trial would not be warranted by such newly discovered evidence, even if the affidavits had been considered below. *See Nelson v. Mueller,* 85 Wn.2d 234, 533 P.2d 383 (1975); *State v. Letellier,* 16 Wn. App. 695, 558 P.2d 838 (1977).

We affirm.

PEARSON, C.J., and PETRIE, J., concur.